COLIGNON, Trustee in Bankruptcy, and others, Appellants, vs. ARTZ and another, Respondents.

*April 7—May 12, 1931.*

*Robert A. Kaftan,* attorney, and *John J. Colignon* of counsel, both of Green Bay, for the appellants.

For the respondent George Artz there was a brief by *Benton, Bosser & Tuttrup* of Appleton, and oral argument by *Roger R. Tuttrup* and *Alfred C. Bosser.*

OWEN, J. This action is brought by John J. Colignon, trustee in bankruptcy of the estate of Alex A. Kriewaldt, bankrupt, with whom Alex A. Kriewaldt, the bankrupt, and Bernice E. Kriewaldt, his wife, joined as plaintiffs, against George Artz and the Appleton State Bank, defendants, to recover certain moneys held by the Appleton State Bank as stakeholder. The purpose of the action was to determine whether John J. Colignon, as trustee in bankruptcy, or Alex A. Kriewaldt, the bankrupt, and his wife, as tenants by the entirety, or George Artz, a lien claimant, is entitled to certain moneys which were by a stipulation paid into the Appleton State Bank, to be held by it until the rights of the various claimants to the fund should be determined. Although the claim of the trustee in bankruptcy and that of the bankrupt and his wife to the fund are hostile, nevertheless they have joined as plaintiffs. As no question has been raised concerning the propriety of this joinder of plaintiffs we give no consideration thereto.

The moneys involved in the controversy are the proceeds of a contract for the sale of real estate in the state of Indiana, which was a final payment made by the vendee on said contract. The contract was assigned to Alex A. Kriewaldt by the vendor of the real estate on January 13, 1925. On

the same day the vendor of the real estate executed a deed thereof to Alex A. Kriewaldt and Bernice E. Kriewaldt, his wife, all as a part of the same transaction. Under the law of the state of Indiana such a deed would vest in the vendees an estate by the entirety, if the grantor had any estate to convey. It is claimed by Alex A. and Bernice E. Kriewaldt that under the law of the state of Indiana they became vested with an estate by the entirety in this real estate, and that it did not pass to the trustee in bankruptcy of the estate of Alex A. Kriewaldt. The trustee in bankruptcy claims that under the law of the state of Indiana the interest of the vendor under a contract to convey real estate becomes personal property; that the vendee is vested with the equitable title to the land; that the vendor holds the legal title thereof merely as security for the payment of the purchase price, and that the relation between the vendor and the vendee is that of equitable mortgagee and mortgagor. While the latter is the general rule and obtains in Wisconsin (*Krakow v. Wille,* 125 Wis. 284, 103 N. W. 1121), the trial court held that in Indiana the vendor's interest continues to be that of real estate, and that, notwithstanding the contract was assigned to Kriewaldt, he and his wife became tenants by the entirety in the real estate by virtue of the deed executed to them jointly by the vendor, and that the trustee in bankruptcy acquired no rights in or to the proceeds of the land contract. In this the trial court was in undoubted error.

It was early held in Indiana that where real estate is sold upon a land contract, or title-bond for a deed, as there expressed, the unpaid purchase moneys, whether secured by note or otherwise, become assets in the hands of the administrator. *Henson v. Ott,* 7 Ind. 512. While we find no later judicial expression upon this exact question in the Indiana Reports, there are many decisions recognizing what appears to be the universal doctrine (note 57 L. R. A. 643) that a contract for the sale of land operates as an equitable

conversion. The vendee takes an equitable title, his interest under the contract becomes realty, and the vendor's interest constitutes personalty.

In *Jackson v. Snell*, 34 Ind. 241, the owner of real estate entered into a land contract to convey same for $32,347. The vendee executed to the vendor three notes of $10,782.33 each, one payable in twelve months, one in two years, and one in four years. After the vendee had paid $20,000 of the purchase money the vendor sold and assigned said notes. Thereafter judgment was recovered against the vendor, and a sale of the vendor's interest in the real estate on execution was threatened. The vendee brought an action to restrain the sheriff from selling said real estate. The court said:

"In *Garr v. Lockridge*, 9 Ind. 92, it is decided that the estate which the vendor has in lands contracted to be sold, but not conveyed, is subject to the lien of judgments obtained against the vendor after the contract of sale, for the amount of the purchase money unpaid. This must mean, of course, the purchase money yet due to the vendor. In this case the vendor, Andrew Jackson, had retained the legal estate as security for the ultimate payment of the purchase money. But this lien or security for the payment of the purchase money had passed from him before the rendition of the judgments and accompanied the promissory notes, which he had assigned away, and which, being negotiable as inland bills of exchange, might be enforced against the plaintiff or against the land at their maturity. That the lien of the vendor was assignable and passed with the notes, is decided in *Brumfield v. Palmer*, 7 Blackf. 227; *Fisher v. Johnson*, 5 Ind. 492; *Kern v. Hazelrigg*, 11 Ind. 443; *Johns v. Sewell*, 33 Ind. 1.

"In *Amory v. Reilly*, 9 Ind. 490, this court says: 'Where the original vendor has not parted with the legal title, it must be intended that he holds it as security for unpaid purchase money; and all the incidents of a mortgage, so far as the lien is concerned, attach to the contract of sale. An unpaid vendor' (and we may add, or his assignee) 'is entitled to proceed as a mortgagee.'

"It is well settled that the assignment of a debt secured by a mortgage carries with it the mortgage security, and where there are several notes secured by the same mortgage, and they are assigned to different persons, the security is distributed accordingly, and the mortgage becomes or continues security for them all, with priority according to the order in which they mature. *Gower v. Howe,* 20 Ind. 396; *Sample v. Rowe,* 24 Ind. 208."

The foregoing is sufficient to indicate that the state of Indiana is in harmony with the rule, seemingly universal, that the interest of the vendor of real estate, after the execution of a contract of sale, becomes personal property; that the contract becomes the principal thing; that his interest in the land is merely that of security; and that an assignment of the contract carries with it as an incident the interest of the vendor in the land. It follows, therefore, that the assignment of the land contract to Kriewaldt vested in him the title to that which the vendor in Indiana had to convey, and that, in the absence of intervening equities, vested in his trustee upon the adjudication of his bankruptcy. The fact that the deed was executed to Kriewaldt and his wife was immaterial. Whoever took title to the property took it charged with knowledge of the rights of the vendee to a deed of the land upon the payment of the purchase price. The deed to Kriewaldt and his wife conveyed nothing of substance. The assignment of the land contract to Kriewaldt carried with it such title as the vendor retained, which was no more than security for the payment of that which was agreed to be paid by the vendee under the terms of the land contract.

It may be remarked here that there is a conflict in the decisions as to whether a judgment against the vendor, in any event, constitutes a lien on the land. Some courts hold that it does, while others hold that it does not. The state of Indiana holds that it does. However, this diversity of hold-

ing seems to depend upon whether the common-law rule limiting the lien of judgments to legal estates has been abrogated by statute in the particular jurisdiction. It is entirely unrelated to the question of whether the doctrine of equitable conversion applies. Thus we see that Kriewaldt and his wife have no claim to the fund.

The question now arises whether Artz has any claim to the fund. His claimed interest is said to arise from the terms of a trust deed executed by Kriewaldt and his wife of the Indiana property, dated February 24, 1925, which recites that "this conveyance is made for the purpose of securing to said trustee all such sums of money or indebtedness as may be owing to him as such trustee and in his individual capacity at this time or hereafter until such trust shall be released in proper form." It is admitted by both Artz and Kriewaldt that this deed was executed for the purpose of securing Artz upon his liability in indorsing a note executed by one Moldenhauer to Kriewaldt for $1,000. Kriewaldt wanted to realize the cash on this note in order to make a payment on a creamery, the purchase of which he was negotiating through Artz as agent. In order to enable Kriewaldt to raise the money, Artz indorsed the note, which was discounted at the bank, and the trust deed was executed to Artz to secure him against liability by reason of such indorsement. The note was paid by Moldenhauer. Artz never sustained any liability by reason of his indorsement. Kriewaldt claims that this was the only reason for giving the trust deed, that he never became indebted to Artz for any other sum, and that he never became liable in any way, shape, or manner to Artz for any other amount.

On the other hand, Artz claims that he acted as real-estate agent in a transaction by which Kriewaldt, in November, 1924, sold to one Bertha J. Krenn a store building, fixtures, and a stock of goods in Antigo. As a part of that transaction Mrs. Krenn agreed to assume the payment of a mort-

gage of $2,500 which was an incumbrance upon the store building. Kriewaldt represented that there were no other incumbrances either upon the store building or the stock of goods. The Bulk Sales Law was not complied with. Shortly after the consummation of this purchase it was discovered that there was another mortgage of $1,100 upon the store building, that there were numerous mechanics' liens thereon, and that bills were owing upon the stock of goods, in all approximating the sum of $2,500 over and above the $1,100 undisclosed mortgage. Mr. Krenn, acting for his wife, pressed Kriewaldt for payment of these outstanding claims, liens, and incumbrances. Artz claims that the Indiana contract and trust deed were delivered to him upon an agreement that he, Artz, would assume and agree to pay all of the outstanding liens and debts against the stock of goods and the store building; that said creditors were informed thereof, and that Kriewaldt promised that, being relieved of the pressure by his creditors, he would pay said liens, and that said trust deed was made for the purpose of indemnifying Artz in case Kriewaldt failed to repay the sums paid by Artz for Kriewaldt's benefit.

Kriewaldt was adjudged a bankrupt May 20, 1925. There was no claim that Artz had paid anything on these liens or claims prior to that date. Within a few days thereafter he paid all of such claims. The first question to be considered is whether there was at any time any agreement between Artz and Kriewaldt, or Artz and Krenn, or Artz and the creditors or any one else which gave rise to any liability or responsibility on the part of Artz. The trial court found there was such an agreement. We have read and re-read Artz's testimony, and we fail to find any agreement established which imposed upon Artz any liability for the payment of these debts and claims. He makes the statement in one part of his testimony that "I promised them all (meaning the creditors) to be quiet and I would pay them." However,

when his testimony is considered as a whole, it does not by any means support any such an unconditional promise to pay the claims of creditors.

In discussing the evidence bearing upon this question we should say, at the outset, that there is no testimony in the case remotely tending to support such an agreement except the testimony of Artz himself. The testimony of Kriewaldt and his wife is directly to the contrary. The testimony of Krenn does not support it. Not a single creditor was called to testify that Artz at any time agreed to pay his claim or to become responsible for its payment. This latter is a most significant circumstance. If such an agreement had been made between Artz and the creditors their testimony could easily have been obtained.

The testimony of Artz is to the effect that the first thing Kriewaldt did to pacify Krenn concerning these claims was to give Krenn a chattel mortgage for $1,100 on some livestock which he owned and which was located on a farm at Birnamwood, to secure Krenn upon the $1,100 mortgage already mentioned. Artz claims that he was at Birnamwood when this chattel mortgage was executed; that after the chattel mortgage was executed he asked Kriewaldt what he was going to do about these other liens; that Kriewaldt then told him that he had a deal on in Indiana, and he asked Artz to tell Krenn not to do him any harm, and he said to Artz, "You help me out." Artz said, "All right, what shall I tell him?" Kriewaldt said, "As soon as I come back from Indiana I will give you that contract, because I will make the deal for sure, and that will pay all the liens on the store." Artz claims that he then went to Antigo and said to Krenn, "Here is your chattel mortgage; I always was a good friend of Kriewaldt, and now don't do him any harm; take it slow, and help the man out of this." Krenn said, "I want these bills paid and no fooling." Artz said, "Let him come back from Indiana and he will come to Antigo right away."

Artz further testified that around the 16th or 17th of January, 1925, he saw Kriewaldt at Birnamwood and asked him, "How did you get along with the business?" Kriewaldt said, "All right; I made that deal; here is the contract; you take that along and keep Mr. Krenn quiet." He also said: "Will you help me, Mr. Artz; you know what circumstances I am in." Artz said, "All right, I will do what I can for you." Kriewaldt said, "You tell Krenn to keep quiet, and when the money comes from Indiana I will pay it." "I said, 'All right, I will do it; I will tell all the people they will be paid, and I keep this contract,' " and he (Kriewaldt) said, "You help me out, can I depend on that?" and "I (Artz) said, 'Sure you can depend on that.' "

Artz further testified that he and Kriewaldt and Krenn went to Miller, one of the creditors, and Kriewaldt paid $100 to Miller at that time. Kriewaldt said to Miller, "Everything will be taken care of, but don't be hard on me; I will take care of everything when I get the money from the Indiana property, and Mr. Artz is going to help me," "and I did." "Did you say anything to the people? A. I told them all; they came in the store, and to some we went with Mr. Krenn and Mr. Kriewaldt; some came to the store when he wasn't there; they had liens, and that icebox had a chattel mortgage on it, and I promised them all to be quiet and I would pay them." "Q. Did you tell them you had security? A. I told them I had that contract, but when I had that contract I talked with my attorneys and they told me Kriewaldt had to make some kind of a deed. I said, 'Tell me what to do and we will make it.' I said, 'The man is willing to do anything to pay the debts, but don't put him in jail, and I will help.' "

Our conclusion from this testimony is that Artz did no more than to persuade the creditors to be lenient with his friend Kriewaldt and, by way of assurance, he told them that when Kriewaldt got his money from the Indiana deal Krie-

waldt would pay them, and that, as further assurance, he told them that he had the Indiana contract. We discover no agreement on the part of Artz to pay these creditors, or any of them. He does not promise Kriewaldt that he will pay them. His promise is that he "will help." The help promised, however, did not extend any further than that he would make an attempt to pacify them by giving them assurance that Kriewaldt had this money coming from Indiana, and that when it came Kriewaldt would pay their claims; that, as a mere matter of further assurance and as an inducement to the extension of leniency to Kriewaldt, he told them that he had this land contract. He did not go so far as to say that the proceeds of the land contract were to be paid to him; that he had authority to receive this money and to pay it out on their claims. His assurance went no further than that he believed Kriewaldt would do as he promised.

There are many other things in the record inconsistent with the claim that Artz agreed in any shape or manner through any agreement with any one to become responsible for the payment of these claims. One very striking circumstance is that on the 25th day of March, 1925, long after this trust deed was given, and after Artz claims to have had possession of the land contract, Kriewaldt gave his note to Mehne & Neilson, one of the creditors, for $800, payable in ninety days. This note was not signed by Artz, nor does he remember to have had anything to do with the transaction. This is certainly inconsistent with the assumption of any responsibility on the part of Artz for the payment of this claim. At a time when Artz claims he had become responsible for the payment of this indebtedness, he and Krenn went to Oconto to see Kriewaldt about the claims. They did not find Kriewaldt at home, but Mrs. Kriewaldt was there, and Artz himself testifies that Krenn told Mrs. Kriewaldt, "You tell Alex these things have got to be taken care of," and that Mrs. Kriewaldt responded, "Never mind, Mr. Krenn,

Mr. Artz has got that trust deed and Alex will take care of everything; when that money comes everything will be paid;" and that in a subsequent conversation Krenn told Artz "it was all right," but he was not satisfied, "and we will not let it sit like that." "He said, 'It has got to be paid.' I said, 'We will pay it as soon as we can.'" Krenn's continual pressure upon Kriewaldt is hardly consistent with the idea that either Krenn or Artz understood that Artz had become responsible for the payment of the claims.

If we assume that the purpose of the trust deed was to secure Artz for advancements that he might make in paying all these creditors, the fact remains that he did not pay any of the creditors prior to the time Kriewaldt was adjudged bankrupt, nor had he become legally responsible for the payment of any such claims. On the 20th day of May, 1925, he had no lien upon nor claim to the Indiana contract. That passed by operation of law to the trustee in bankruptcy on the 20th day of May, 1925. We are not called upon to consider whether his agreement to pay these claims was valid under the statute of frauds, or whether the trustee in bankruptcy may raise that question, for the simple reason that we find no agreement on the part of Artz to pay these claims either within or without the statute of frauds. The title to the land contract having passed to the trustee in bankruptcy on the 20th day of May, the voluntary payments made by Artz after that date do not give him any lien upon or claim to the proceeds of the Indiana contract now held by the Appleton State Bank as stakeholder, and judgment should have been entered so adjudging, and ordering the Appleton State Bank to pay such moneys to the trustee in bankruptcy.

*By the Court.*—Judgment reversed, and cause remanded with instructions to enter judgment in accordance with this opinion.